ANTHONY R. GALLAGHER
Federal Defender
Federal Defenders of Montana
104 2nd Street South, Suite 301
Great Falls, Montana 59401
anthony_gallagher@fd.org
Phone: (406) 727-5328
Fax: (406) 727-4329
        Attorneys for Defendant Shad Huston

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHAD JAMES HUSTON,<br><br>Defendant. | **Case No. CR-14-46-GF-BMM**<br>**Case No. CR-15-35-GF-BMM**<br>**Case No. CR-15-42-GF-BMM**<br><br>**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING AND REQUEST FOR DOWNWARD DEPARTURE AND/OR DOWNWARD VARIANCE** |

Shad James Huston ("Mr. Huston"), by and through his attorneys, Anthony R. Gallagher and the Federal Defenders of Montana, submits this Sentencing Memorandum in accord with the Court's Sentencing Scheduling Order(s) of November 3, 2015.  See Case No. CR 14-46, Doc. 170;  Case No. CR 15-35, Doc. 37; and Case No. CR  15-42, Doc. 33.

## I.      Introduction

For a variety of reasons not worth detailing in this context, this is not in the mine run of fraud cases.  Charges were initially filed in October 18, 2013.  Illegal activities involved various co-defendants, corporate entities and related parties extending over several years.  Litigation was intense and extensive.  Mr. Huston at one point faced five Indictments.  He eventually tendered pleas of guilty in three:

- On September 17, 2015, Mr. Huston tendered a plea of guilty to all counts in Case No. CR-14-46-GF-BMM admitting that he knowingly and willfully evaded the reporting requirements of 31 U.S.C. § 5313(a), by failing to file currency transaction reports, in violation of 31 U.S.C. §§ 5324(a)(1) and 5322(b);

- on November 2, 2015, he plead guilty to Count III of the Indictment in Case No CR-15-35-GF-BMM, Bribery of a Tribal Government Official, in violation of 18 U.S.C. § 666(a)(2); and

- on the same date in Case No CR-15-42-GF-BMM he entered a plea of guilty to Count I of the Indictment, False Claims Act Conspiracy, a violation of 18 U.S.C. § 286.

Mr. Huston did very wrong.  He readily admits that.  Truly remorseful, he now comes before the Court for sentencing.  He is a lesser man than just a few short years ago.  He has already suffered perhaps irreparable damage to his marriage, had to make painful revelations about his deceitful actions to his children, and has seen the decline in his parents' health.  He lost his reputation as an honest hardworking Havre businessman, is financially broken, and now faces federal prison.

## II.     The Sentencing Procedure

The Ninth Circuit in *United States v. Carty and Zavala*, 520 F.3d 984 (9th Cir. 2008) (*en banc*) (hereinafter, *Carty*), indicated that the basic framework for establishing the sentence in a criminal case is now settled.  *Carty*, 520 F.3d at 990-92.  "'[T]he Guidelines factor [may not] be given more or less weight than any other.' So while the Guidelines are the 'starting point and initial benchmark' and must 'be kept in mind throughout the [sentencing] process,' the Guidelines range constitutes only a touch-stone in the district court's sentencing considerations."  *United States v. Autery,* 555 F.3d 864, 872 (9th Cir. 2009)(citations omitted).   In making its sentencing findings the Court should expressly mention a § 3553 factor urged by a party, even if the sentencing court assures that it has considered the § 3553 factors.  See *Rita v. United States*, 551 U.S. 338, 357, 127 S. Ct. 2456 (2007).  See also *United States v. Ressam*, 593 F.3d 1095, 1119 (9th Cir. 2010).

Most sentencings are excruciating, for defendants and their families and friends, for lawyers who champion and truly believe in their clients' causes, and sometimes for judges, called on to marshal matrices of seemingly irreconcilable interests.  But no matter how difficult for the participants, most sentences are imposed quietly, with little public interest, lingering only in the minds and changed routines of the people immediately affected.

Mr. Huston should not be sentenced, any more than any other defendant should be sentenced, without an attempt, however imperfect and difficult, to stand in his shoes, see what he saw, hear what he heard, and now, to experience what he has over the last three years with his world in tatters.  As modified by *Booker*, the Supreme Court emphasized that 18 U.S.C. § 3553(a), "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  The Guidelines, like any formulaic attempt at sentencing, mocks that principle.  That is why, after correctly calculating the Guidelines, the § 3553(a) factors must be considered with the parsimony provision paramount so that sentencing will be tempered by reason, individualized consideration, and empathy.

## III.   Pertinent Sentencing Factors in 18 U.S.C. § 3553(a)(1), (3) - (7)

### A.    The Offense and the Offender – 18 U.S.C. § 3553(a)(1)

Shad James Huston was born and raised in Havre, Montana, where his parents operated Leon's Buy and Sell, a pawn shop.  From his early teens, after graduation from college and even while employed as a teacher, he assisted his parents in operating the business.  Over the years he established friendships and business relationships with members of the Chippewa Cree Tribe.  In the years leading up to these charges, Mr. Huston was approached with various business initiatives.  In 2010,

following a flood, he entered into contracts for work on the Tribe's recovery and reconstruction efforts, though aware the Tribe was immune from lawsuits should something go awry.  All along Mr. Huston was assured he would be paid in full.  He was not.

Mr. Huston was in desperate straits for money to keep himself solvent, his family fed, and his businesses afloat.  He transferred funds from one business to another to stay in operation.  The Tribe owed him hundreds of thousands of dollars. There was no prospect for prompt and total payment.  Over the course of time he was presented with opportunities to get the money he was owed and make even more, but through illegal means.

Most of us would like to believe that when confronted with Mr. Huston's dilemma we would have had the fortitude to stand up to those who encouraged him to eschew his values and we would have disassociated ourselves from the Eastlick, Belcourt, Houle schemes that promised substantial, but illegal, rewards.  Regrettably, Mr. Huston did not avoid the temptation.  With his businesses in decline and family in need, he gave in to it.  As he has readily admitted, he failed to file currency transaction reports, made improper payments to the Roads Department director, and conspired to submit false claims.  The full panoply of his involvement was revealed to investigators during debriefings.

Shad Huston was not the central figure in the various schemes. That was Jim Eastlick. He was not in a decision-making posture nor respected position like Houle, Belcourt, Sunchild or Rosette. He followed the lead of those who designed the schemes. As one Special Agent alluded to recently, Shad was working as a conduit. If he was perceived at some point as a driver, that view does not match his true role as revealed through months of additional investigation, Change of Plea inquiries by the Court (including the incisive questioning during Mr. Huston's hearing on November 2, 2015), Offers of Proof, and sentencing arguments in these cases. In all fairness, he was the chauffeur – behind the wheel, at times suggesting the route, perhaps proposing the vehicle, but not determining the destination.

Since reaching rock-bottom morally and financially, Mr. Huston has endeavored to pick up the pieces. He negotiated settlements with the United States. He pleaded guilty. He cooperated with authorities. While he has tried to get back on his feet, he is still in poor financial condition. See PSR, ¶¶ 98-108. He is self-employed (PSR ¶¶ 96-97) and continues to support his family, while at the same time a full time father to his children. PSR ¶¶ 71-72, 75. He has begun to address his alcohol addiction. His relationship with his wife, tarnished by the circumstances surrounding these crimes and his abuse of alcohol, is further beclouded by the uncertainties of this sentencing proceeding. PSR ¶¶ 81-83, 85-88, 91.

**B.      The Kinds of Sentences Available – 18 U.S.C. § 3553(a)(3)**

The PSR accurately states the statutory punishments for the offenses of conviction.  PSR ¶¶ 110, 113-114, 116, and 118.

**C.      The Guidelines and Policy Statements  – 18 U.S.C. § 3553(a)(4), (5)**

The PSR is wrong in assessing a four level increase (PSR ¶ 50) for public official.  While Mr. Rosette is considered a 'public official' for purposes of 18 U.S.C. § 666(a)(2), he is not considered a public official for purposes of USSG § 2C1.2. Application Note 1 defines a public official in the context of someone who is a representative of a Federal, State or local government.  Mr. Rosette was not such an individual.  Accordingly, the 4 level enhancement is inappropriate.  Alternatively, if the Court finds that Mr. Rosette was a public official for the purpose of the enhancement, the four (4) level increase still does not apply.  Given a base level of nine (9), plus the increase under USSG §2Cl.2(b)(1) (2 levels) and USSG §§ 2Cl.2(b)(2) and 2B 1.1 (b)(1)(G) (12 levels) the subtotal is 23.  Since the level is already above 15 before application of § 2Cl.l(b)(3), the four points are not added to reach 15.  The cap having been met, § 2Cl.l(b)(3) should not be applied.

Even if ruled to be correct, the advisory Guideline well exceeds what is sufficient to address the purposes of sentencing enumerated in 18 U.S.C. § 3553(a). Departure downward and variances downward are appropriate.

1.    **Request for Departure: A Substantial Downward Departure Pursuant to USSG 5K1.1 Beyond That Recommended by the Government Is Appropriate.**

The Government agreed that if Mr. Huston satisfied all of the terms of the cooperation agreement, the prosecution would file a motion pursuant to § 5K1.1 requesting the Court to sentence the defendant in light of the factors set forth in § 5K1.l(a)(1)-(5).   Such a motion will allow the Court to consider a term below the advisory range.   And, as stated in the Background Note to § 5K1.1, "[t]he nature, extent, and significance of assistance can involve a broad spectrum of conduct that must be evaluated by the court on an individual basis."  Thus, the Court has "latitude" to reduce the sentence based upon all relevant factors.  *Id.*

Once the Government moves under the guidelines and the statute based on substantial assistance, the District Court is not bound by the Government's recommendation as to how much of a sentencing reduction is proper and can depart more than the Government recommends.   USSG § 5K1.1(a), p.s., 18 U.S.C. § 3553(e); *United States v. Udo*, 963 F.2d 1318, 1319 (9th Cir. 1992).

Shad Huston's cooperation was substantial and reliable.  In exhaustive proffer sessions, debriefings, telephone conversations, and document transmissions, he corroborated and supplemented evidence, supplied essential context and insight to assist prosecutors in assessing the culpability of others, and helped to penetrate the

veil of collusive relationships and surreptitious financial dealings of targets of the Guardians Project.[1]   The defense believes that Mr. Huston's cooperation and information he provided were key factors in some defendants' decisions to forego trial and plead guilty pursuant to negotiated settlements with the United States.  And his assistance continues.  Recently, in support of future prosecutions, Mr. Huston gave crucial information regarding other nefarious entities and individuals.

Yet another reason merits the Court's consideration when weighing the extent of downward departure for substantial assistance:  the necessity to motivate others to cooperate with law enforcement.  A departure downward which appreciably rewards a defendant for giving truthful and complete assistance to authorities will encourage other similarly situated defendants to provide assistance.  Such aid is essential to effective law enforcement, especially with respect to economic crimes when verification – in the form of records, emails, and the like – can mean the difference in the outcome of pending cases or when intimate knowledge is needed to establish

---

[1]  "Since the Guardians Project began obtaining indictments from the federal grand jury in late 2012, thirty five indictments and two informations have been filed charging 77 defendants and resulting in over 100 felony convictions for crimes including conspiracy, bribery, fraud, embezzlement, extortion, obstruction of justice, money laundering, blackmail, and tax evasion."  See http://www.justice.gov/usao-mt /pr/justice-department-inspector-general-commends-montana-us-attorney-s-guardi ans-project.

a sound foundation for new prosecutions.  A meaningful reduction in sentence for Mr. Huston will send a signal to other defendants that cooperation will pay tangible dividends at sentencing.

       **2.**       **Request for Variance for Policy Considerations:  To Correct Unreasonable Loss Table in § 2B1.1.**

A Guidelines sentence, driven as it is so heavily by loss, does not reflect the nature and circumstances of the offenses, Mr. Huston's role, his function within the overall scheme, relevant conduct, and his history and characteristics.  When it comes to cases involving fraud or economic loss, the Guidelines cannot be afforded a presumption of reasonableness, because the loss amount section of the guidelines is not based on empirical evidence or national research.  See *United States v. Rita*, 551 U.S. 338, 350 (2007) (Guidelines are afforded the presumption of encompassing the dictates of §3553(a) and *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (where guideline not based on empirical evidence or national data, sentencing judge free to find that the guideline yields a sentence contrary to the goals of § 3553(a)).

The labyrinthine Guideline covering economic loss (Chapter 2B1.1) is a prime example of an instance where the Guidelines lack a basis in empirical data and national experience. "For policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for white-collar

crimes." *United States v. Herink*, 2012 U.S. Dist. LEXIS 105549, at *12 (D. Neb. July 30, 2012) (citation omitted).  See also *United States v. Corsey*, 723 F.3d 366, 377-81 (2d Cir. 2013) (Underhill, J. concurring) (loss amount guidelines not based on empirical evidence or national data.).  Because the Commission, in looking at empirical data, had determined that many fraud sentences were disproportionately low, it adopted a paradigm of short but definite terms of imprisonment, as opposed to the frequent pre-Guidelines practice of sentencing first time, non-violent white-collar offenders to probation.  See *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, 44, 47, 55-60 (USSC November 2004) (hereinafter Commission Fifteen Year Report).  It also placed the pecuniary loss from the offense as the primary determinant of length of sentence.  *Id.* at 55.

Since the original guidelines were promulgated in 1987, however, fraud sentences have grown increasingly punitive and disproportionate through increases in the number of specific offense characteristics (6 to 18), and number of points for the amount of the loss.  The Commission has all but abandoned its original guidepost for white-collar sentencing – that short but definite periods of imprisonment achieve an adequate deterrent effect, provide just punishment, and are proportional to sentences for other offenses.  Worse yet, these increases have been unaccompanied

by empirical and experiential support that might demonstrate why longer sentences were needed, or why shorter terms were insufficient to achieve the goals of sentencing. *United States v. Spencer*, 700 F .3d 317, 328 (8th Cir. 2012) (Bright, J., dissenting) ("The fraud guidelines have been heavily criticized because they no longer provide a reasonable starting point for sentencing . . . Adjustments based on the amount of loss lead to astronomical sentences that have little connection to criminality") (internal citation omitted); *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (comparing the lack of empirical support that the Guideline regime achieves the objectives served by sentencing with "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white-collar' offenders").

### 3. Request for Variance Based the Need to Provide Restitution.

With an amendment on October 27, 2003, the guidelines prohibited downward departures for the purpose allowing a better opportunity to pay restitution. USSG § 5K2.0(d)(5). But today, "[j]ust because a consideration [was] improper under the mandatory Guidelines regime does not mean that it is necessarily improper under the advisory Guidelines regime." *United States v. Garcia*, 497 F.3d 964, 971-72 (9th Cir. 2007). Based on the facts of an individual case, judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the

Guidelines," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks omitted), and when they do, the courts of appeals may not "grant greater fact-finding leeway to [the Commission] than to [the] district judge." *Rita v. United States*, 551 U.S. 338, 347 (2007). Although courts must consider the guidelines as one of the § 3553(a) factors, they cannot blindly assent to policy decisions of the Sentencing Commission. *Pepper v. United States*, 562 U.S. __, 131 S.Ct. 1229, 1247-48 (2011); *Gall*, 552 U.S. at 46-47; *Rita,* at 348, 351, 357.

*United v. Edwards*, 595 F.3d 1004 (9th Cir. 2010), a bankruptcy fraud case, is a prime example of a variance based at least in part on the need to provide restitution. Where the advisory range was 27-33 months, Judge Molloy imposed a sentence of probation, seven months of which was to be served under house arrest, in part to better allow the full payment of restitution. The Ninth Circuit found no abuse of discretion in an 8 level downward adjustment in *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006). In affirming the sentence the Circuit Court said the "sentence of probation may have made Defendant better able to provide restitution to the victims of her crime." See also *United States v. Peterson*, 363 F.Supp.2d 1060 (E.D. Wisc. 2005) (though defendant pled guilty to defrauding bank of $80,000 and guidelines called for a range 12 to 18 months imprisonment, pursuant to § 3553(a)(7), court sentenced him to only one day in prison and supervised release of five years so

he could be employed and pay restitution); *United States v. Coleman*, 370 F.Supp.2d 661 (S.D. Ohio 2005) (despite advisory range of 6-12 months in a drug misbranding case, a sentence of five years probation, as opposed to one year of imprisonment or imprisonment with supervised release, affords more time to pay restitution).

Shad Huston is liable for $500,000 in restitution. He will be able to begin paying restitution more promptly if he is not subjected to a term of incarceration beyond that requested by the defense. Mr. Huston can begin to pay his debt, rather than drain government resources (see PSR ¶ 120), if granted a lesser period of imprisonment followed by supervised release.

### D.    The need to provide restitution – 18 U.S.C. § 3553(a)(7)

The need to provide restitution is the final element discussed in 18 U.S.C. § 3553(a) and *Booker*. Mr. Huston agrees that restitution must be paid.

## IV.    The Sentencing Mandate in 18 U.S.C. § 3553(a)(2)

### A.    Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

Mr. Huston acknowledges the magnitude of the harm he inflicted on the Tribe and the United States. His shame is profound in light of the pain he caused his family and those who count on him. His pleas of guilty and statements to the Court and the probation officer, combined with his candid and complete cooperation with the

authorities, demonstrate his respect for the law.  A lengthy prison sentence may undercut the need for his sentence to promote that respect.  As the Supreme Court acknowledged quoting the district court in *Gall v. United States*, 128 S. Ct. 586, 599 (2007), "'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.'"

The question then becomes: what is just punishment?  A lengthy custodial sentence is reasonable only if it appears that confinement is necessary to accomplish the primary objective of protecting society and to achieve the related goals of deterrence, rehabilitation, or incapacitation.  But punishment for financial crime as it has developed in the federal system is now an inherently retributive practice. Contrary to that progression, in enacting the Sentencing Reform Act of 1984, Congress intended that "prison resources [would be], first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service."  See Pub. L. No. 98-473, §§ 217(a), 239, 98 Stat. 1987, 2039 (1984).

Nor did the offenses viewed as "serious" by the Commission meet any other criteria requiring prison other than those who are the most dangerous in Congress' view.  See 28 U.S.C. § 994(i).  Congress thus instructed the Commission to ensure "that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious injury."  28 U.S.C. § 994(j).  In Congress' view, "other types of sentences would serve the purposes of sentencing equally well without the degree of restriction on liberty that results from imprisonment."  S. Rep. No. 98-225, at 59 (1983).

The past thirty years represent a true aberration in the penological history of this country.  For some reason, incarceration has become the norm for non-violent first-time offenders, exceptionally long sentences that would shock the conscience of previous generations.[2]  The overriding requirement for any criminal justice system is

---

[2]  Some studies mark the figure at 36% longer sentences since 1990.  If the Guidelines were intended to remedy disparities and inject some degree of certainty into sentencing, any honest appraisal must include the fact that they were also intended to and have increased the severity of sentences as well, which have more than doubled. On average, federal offenders receive substantially more severe sentences under the guidelines than they did in the pre-guidelines era.

that it be fair and equitable, that sentences imposed must themselves be evenhanded, accounting not only for the severity of the offense, but the peculiar circumstances of the individual offender.  Just punishment does not mean a long prison term.

## B.   Deterrence

Section 3553(a) requires imposition of a sentence that serves crime control purposes – e.g., deterrence and incapacitation.  Congress directed that all sentences must "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."  See 18 U.S.C. § 3553(a)(2)(B) and (C).  Research demonstrates that individuals like Mr. Huston (no criminal history; non-violent offender) pose no threat to society if granted a non-custodial sentence.

An alternative sentence, such as community confinement, home detention, or intermittent confinement, would deter him from future criminal behavior.  See generally, David Weisburd, et al., S*pecific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995) (finding no difference in deterrence of white collar offenders, presumably the most rational offenders, between imprisonment and probation).  See also Laura Baber, *Results-based Framework for Post-conviction Supervision Recidivism Analysis*, FED. PROBATION, Volume 74, Number 3 (2010) (study of 150,000 federal offenders

showed 85% of people on probation and 77% of people on supervised release after a period in custody remained arrest-free within the first three years of their term).

### C.     Protect the Public from Further Crimes of the Defendant

With respect to the factor in 18 U.S.C. § 3553(a)(2)(C), an extended term of imprisonment is not warranted.  Because of the rights lost, business opportunities diminished, and damage to family and community, a lenient sentence will not remove the millstone that Mr. Huston is doomed to carry around his neck for years to come. See *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (the "need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant").  If a custodial sentence is imposed, the public will be protected by a short term since that custodial period will be followed by the rigorous demands of supervised release and the assurance of additional imprisonment if the conditions of supervision are violated.

### D.     Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

As the PSR details (¶¶ 83-90), alcohol has presented problems for Mr. Huston. In light of his history of abuse and admitted alcoholism, if a sentence of incarceration is imposed, Mr. Huston respectfully requests a judicial recommendation for the 500-hour Residential Drug and Alcohol Program (RDAP).

## V.   Financial Condition and Fines

"Based on information contained in th[e] presentence report, it appears the defendant does not have the ability to pay a fine within the guideline range."  PSR ¶ 109.  A fine should not be imposed.  See USSG § 5E1.2, Cmt. #3.  See also *United States v. Outland*, 109 F.3d 539, 549 (9th Cir. 1994); and *United States v. Ladum*, 141 F.3d 1328, 1344 (9th Cir. 1998).

## VI.   Conclusion

Mr. Huston puts his fate in the hands of this Court.  He wants only to return to Havre, to resume contributing to, not detracting from, his community.  The Court should consider all the facts of the case, as well as the life he led until he descended to the depths of illegality, his efforts to remedy his wrongs by aiding the Government, and the affect of a sentence of imprisonment on his three young daughters.

If incarceration is imposed, we urge the Court to limit the term to 18 months. Mr. Huston asks for self-surrender and requests two Judicial recommendations:  (1) that he be designated to FPC Yankton (South Dakota), and (2) that he participate in the 500-hour Residential Drug and Alcohol Program (RDAP).

RESPECTFULLY SUBMITTED this 8th day of February, 2016.

/s/ Anthony R. Gallagher

## CERTIFICATE OF SERVICE - L.R. 5.2(b)

I hereby certify that on February 8, 2016, a copy of the foregoing document

was served on the following persons by the following means:

| | |
|---|---|
| 1, 2 | CM-ECF |
| 3 | Mail |
| 3 | E-Mail |

1.  CLERK, U.S. DISTRICT COURT   3.   SHAD JAMES HUSTON
                                            Defendant
2.  CARL E. ROSTAD
    RYAN G. WELDON
    United States Attorney's Office
         Counsel for the United States

                          /s/ Anthony R. Gallagher